Pierre CHARLES, Le Liquidateur Amiable, Societe Anonyme Du Vermouth Export Pissis-Noilly, Plaintiff-Appellant,

v.

JUDGE & DOLPH, LTD., Defendant-Appellee.

No. 12418.

United States Court of Appeals
Seventh Circuit.

Feb. 25, 1959.

Howard T. Markey, Norman S. Parker, James G. Staples, Chicago, Ill., for plaintiff-appellant.

Emil N. Levin, Elmer M. Leesman, Friedlund, Levin & Friedlund, Chicago, Ill., for appellee-defendant.

Before DUFFY, Chief Judge, and SCHNACKENBERG and HASTINGS, Circuit Judges.

DUFFY, Chief Judge.

This is a suit for damages for breach of contract. The trial was to the court. No oral testimony was heard. At the conclusion of plaintiff's case, plaintiff moved for a finding and judgment in its favor pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. The trial court granted judgment for the defendant. The counterclaim which had theretofore been interposed by defendant was withdrawn.

Defendant is a distributor of wines and liquors with principal place of business at Chicago, Illinois. It has imported vermouth into this country since 1933. Plaintiff company, a French corporation, was a manufacturer of French vermouth, and was located in or near Paris, France.

On December 20, 1946, the plaintiff and defendant entered into a written contract. The parties to that contract and to this suit are in dispute as to whether the contract was one of purchase and sale or a contract establishing a principal and agent relationship. Without attributing any particular significance to the phraseology of the agreement at this point, we shall sometimes use the language of the contract and refer herein to plaintiff as principal and the defendant as agent.

Prior to this suit, plaintiff company became bankrupt, and Pierre Charles as "Le Liquidateur Amiable" is carrying on this suit in behalf of the company. Any reference herein to plaintiff or plaintiff company refers to Societe Anonyme Du Vermouth Export Pissis-Noilly with whom defendant signed the agreement.

Under the contract, the defendant was given the exclusive right to sell and distribute plaintiff's vermouth in this country for a period of five years. Plaintiff agreed to sell its product to defendant at $9.50 per case of twelve bottles during the first four months of the agreement, and further provided the price could be revised from time to time by the principal to meet any change in the cost of raw materials or other production costs. Adjustment in prices was also authorized on the basis of changes in the rate of exchange of the currency of the two countries. The contract stated: "In both cases, the express intention of the parties is that the product of the Principal be sold at a price which will not be higher than the price of the best competing product of the same type." Defendant agreed to pay "for all goods sold under this agreement by documentary bank credits at the time of shipment from the Principal's factory." The contract also provided that if the Agent failed to order the number of cases each month as specified, the principal could elect to terminate the agreement on thirty days' notice. There was also a provision that if there was any other breach of the provisions of the contract by either Principal or Agent, either party could terminate same upon giving sixty days' notice in writing.

Under the contract, plaintiff undertook to furnish a minimum of 1,500 cases per month over a five year period, shipments to start on January 15, 1947. Defendant agreed to order not less than 1,500 cases per month during the first year, 2,000 cases per month during the second year; 3,000 cases per month during the third year; and 4,000 cases per month during the fourth and fifth years. Defendant agreed not to sell any other imported French vermouth during the continuance of "this agency," and to sell it under no other name than "Vermouth Export Pissis-Noilly."

The agreement provided that defendant should bear all expense for advertising the product, and with reference to a sample which plaintiff had furnished, provided "The Principal undertakes to furnish the product lighter in color and drier in taste than the sample submitted to the Agent, but the product shall be of the same character and quality as the sample submitted to the Agent."

The first shipment of vermouth consisting of 1,500 cases was shipped from France on April 3, 1947. This shipment was paid for by defendant in France. Defendant obtained a sample on May 20, 1947. Promptly thereafter defendant wrote to plaintiff company complaining of the packaging and the branding on the cases. Complaint was also made that the product contained large crystals of tartaric acid, and also that there was an "eye appeal" of dirty vermouth. A laboratory to which a bottle from the first shipment had been submitted, reported to defendant that the tartaric acid crystals could easily be filtered out, and, as this vermouth was made with a certain amount of light-bodied white wine, some sediment was likely to show up. Plaintiff company wrote to defendant on June 12, 1947, agreeing to remedy the defects in marking the cases and also explaining the presence of tartaric acid in any vermouth which has a white wine base. However, plaintiff company assured defendant that in the next shipment, the tartaric acid in the product would be reduced to ⅛th of the amount in the first shipment.

On June 17, 1947, and apparently before receipt of plaintiff's letter of June 12, 1947, defendant wrote plaintiff company asking for credit for certain breakages and related the advice of its chemist that the vermouth be filtered. Defendant again asked for plaintiff's "decision or suggestions" and also observed that filtering the entire shipment would be very expensive. Plaintiff replied on June 26, 1947, after the second shipment of 1,500 cases had been made, and predicted that defendant would be satisfied with such shipment.

On July 4, 1947, plaintiff wrote that credit for $13,500 for the second shipment had not been made as required by the contract, and informed defendant that another shipment of 1,500 cases would be made on July 24th. Defendant cabled on July 15, 1947 asking plaintiff to delay the July shipment until the June shipment had arrived and been inspected. Defendant stated the first shipment was not saleable due to excess tartaric acid crystals.

On July 24, 1947, plaintiff company wrote to defendant stating that the vermouth could be treated on the spot, and offering to reimburse the cost that this extra work would entail, and later did send $1,500 to defendant for that purpose. On August 6, 1947, defendant wrote plaintiff that it would be necessary to filter the entire 1,500 cases of the first shipment as all of the merchandise from this lot had been returned to them. The letter concluded: "Please do not make any shipments until you are notified by us by cable." On August 22, 1947, defendant wrote that the bottles used were of improper size and that the labels did not indicate the correct amount of contents of the bottles. Defendant paid $294.45 extra taxes on the second shipment due to the extra quantity of vermouth in the bottles.

On November 24, 1947, one Claude R. Myers wrote to the president of defendant upon behalf of the president of plaintiff. Defendant answered under date of December 3, 1947 stating it had refiltered and rebottled the vermouth at great expense, but to the date of the letter, they were able to make saleable only 200 cases of the original 3,000 cases. Defendant expressed the hope that it could dispose of the remaining 2,800 cases after the first of the year. The letter also stated: "We find the quality of this vermouth, after we have cleaned it up, to be excellent."

On December 30, 1947, defendant again wrote Myers stating it had shipped a number of orders to other states but had been compelled to pay return freight and accept the return of the merchandise as unfit, and that defendant's loss amounted to many thousands of dollars; that until defendant had reconditioned and sold its stock Pousset (president of plaintiff) was free to ship to whomever he pleased in the United States.

During the period from December 17, 1948 to June 10, 1949, defendant withdrew at least 698 cases from the second shipment. On August 9, 1949, defend-

ant cabled plaintiff requesting 15,000 labels for relabeling the first shipment. By letter to plaintiff dated September 9, 1949, defendant gave a sixty-day notice of termination of the contract. The letter again mentioned that defendant was required to refilter the vermouth because of cloudiness and sediment therein. Reference was also made to defendant's previous request for new labels. The letter stated: "You can readily appreciate the tremendous expense we have gone to in uncorking the bottles, refiltering the merchandise, removing the labels from the bottles, placing new labels thereon, recorking and repacking."

Sometime prior to November, 1949, defendant completed negotiations with the manufacturers of Noilly-Prat, the best known of imported French vermouths, and, in November, 1949, announced to the public that it had been made the distributor of Noilly-Prat.

Plaintiff asked damages for breach of contract totaling $523,500 made up of three items: 1) Balance due on two shipments delivered, $1,500; 2) For shipment refused, $13,500; and 3) For loss of profits on balance of contract, $508,-500.

Defendant's answer admitted the execution of the contract and the receipt of two shipments of 1,500 bottles each, and alleged it had paid for same in full. The answer further alleged that the first shipment was unmerchantable and unsaleable, and that the second shipment contained excessive tartaric acid crystals and sediment, and that the vermouth was packaged in odd sized bottles ranging from 30 ounces to 33.4 ounces. The answer further alleged that defendant, up to September, 1949, attempted to recondition and dispose of the vermouth, but found the task utterly impracticable and unprofitable; that defendant elected to terminate the contract for failure of the vermouth to conform to the warranties expressed and implied.

The court heard plaintiff's case upon the issue of liability alone. The court found that plaintiff had breached the implied warranty that the goods would conform to sample, and be of merchantable quality. The court also found that plaintiff company was in substantial default at the time defendant terminated the agreement.

██ In a large measure, this contract was to be performed in Illinois. It is the Illinois law that "Parties are presumed to contract with reference to the law of the state where their contract is to be performed, rather than of the state where the contract was made, and to agree to be governed by such law." George v. Haas, 311 Ill. 382, 386, 143 N.E. 54, 55.

██ Our task in reaching a correct determination of the issues in this case is made difficult because the District Court rendered its decision at the close of plaintiff's case. In defendant's brief there are frequent references to and reliance upon depositions of Brust and May which have not been received in evidence. Defendant contends that because plaintiff made reference to and relied upon certain parts of these depositions, it has the right to use the balance of same. If defendant had offered any testimony on its behalf it probably would have been permitted to make such use of the balance of these depositions, but on this appeal we cannot consider depositions which have not been received in evidence. Worsham v. Duke, 6 Cir., 220 F.2d 506; United States v. City of Brookhaven, 5 Cir., 134 F.2d 442.

In disposing of the case at the end of plaintiff's testimony, the District Court entered a short memorandum and order. In a complicated situation such as faces us here, it would be helpful to have detailed findings of fact and conclusions of law as provided for in the Federal Rules.

The decision of the District Court was based in part on the ground there was an implied warranty that the goods would conform to sample and be of merchantable quality, but section 49 of the Illinois Uniform Sales Act (Chap. 121½, Ill.Rev. Stats.) provides: " * * * But, if, after acceptance of the goods, the buyer fail to give notice to the seller of the

breach of any promise or warranty within a reasonable time after the buyer knows, or ought to know of such breach, the seller shall not be liable therefor."

■■ It may be that if defendant presented evidence, it could show some notice of a claim for breach of implied warranty. From the record now before us there is no showing that prior to the commencement of this suit, defendant ever gave notice of a breach of warranty. It is well established that notice of defects is not a notice of breach of warranty. In an opinion by Judge Hand in American Mfg. Co. v. United States Shipping Board Emergency Fleet Corp., 2 Cir., 7 F.2d 565, 566, the court said: "The notice 'of the breach' required is not of the facts, which the seller presumably knows quite as well as, if not better than, the buyer, but of the buyer's claim that they constitute a breach. The purpose of the notice is to advise the seller that he must meet a claim for damages, as to which, rightly or wrongly, the law requires that he shall have early warning."

If the defendant did not give any notice other than as now shown in the record before us, we would be compelled to hold that defendant did not give a notice of its claim of a breach of implied warranty within a reasonable time as required by the Illinois Statutes.

The same situation obtains on the claim that the vermouth did not conform to sample. In this connection, defendant again made references to parts of the depositions which were not received in evidence. The contract provided that: "The Principal undertakes to furnish the product lighter in color and drier in taste than the sample submitted to the agent, but the product shall be of the same character and quality as the sample submitted to the Agent." From the record now before us we cannot pass upon the validity of this defense, and again we would be greatly helped by findings that the court might make in the event that oral testimony is presented.

As to the District Court's conclusion that plaintiff was in substantial default,

we would be helped if we knew the basis for such a conclusion. Upon retrial, and after considering evidence presented by both parties, the District Court will be better able to specify the nature and details of any default that may be established.

Defendant has suggested a defense of "lack of mutuality" to support its argument that the contract was void. We think it inadvisable to give a sort of advisory opinion based upon the bare bones of the written instrument. Both parties operated under it for a considerable period of time. There may have been modifications agreed to or a practical interpretation by the parties of certain provisions in the contract. We, therefore, express no opinion.

Reversed and remanded for a new trial.